2012-12-33 RADIO SYSTEMS CORP v. ANATEC v. TOM LALOR v. BUMPERBOY Specifically, in this case, the issue is where is the base of the electrode. This is a dog collar. We have electric electrodes that go into the dog's neck to help train the dog for hunting purposes, other purposes. And the question before the court below is where is the base of the collar? Where is the base of the electrode in relation to the collar? Now, in most cases, I would say if the question before this court were where is the ceiling of this courtroom, or where is the floor of this courtroom, it would be very simple. The ceiling is up there, the floor is down here. It is equally clear and simple, I believe, in this case, as the question I just posed. If we look at the figures in the actual patent, this is specifically figures 7, 8, and 9. I believe these appear at pages A56 and 57 of our principal brief. If you have those up before you, Your Honor, you can see that there is a reference numeral 26. You hear it, Judge? Yeah. Reference numeral 26 that the patent refers to as the electrode base. If we look at figure 8, appearing on page A57, we see figure 26. And it's right down at what natural language and common sense would say is the base of the electrode. Right at the very bottom of the electrode, where it intersects the rest of the housing. Same with figure 9. Reference numeral 26 is at the base of the electrode. We say that that is how the claim should be interpreted. That is where the electrode base should be. It's where it's shown in figures 7, 8, and 9, and it's where it is described in the patent itself. Specifically, top of column 5, lines 1 through 5, it says that the electrode has an electrode base, 26, located at the intersection of the inside surface, 18, and the electrode, 24, and an opposite distal tip, 28. Well, again, back to our figures. Distal tip, 28, is at the top. So we think of this as a mountain. We have a mountain here. Top of the mountain is at 28. Base of the mountain is at 26. We believe that one skilled in the art interpreting this patent would be quite clear on where these structures are. Now, a question that would reasonably come up here is, given how clear it appears to me to be where these terms are, why did the district court get it wrong? The district court, in granting motion for summary judgment of non-infringement, said that the base of the electrode is not where I put it, where figure 26 puts it. If we look at page A11, again, this is in our principal brief, this is a figure that was included in the district court's opinion, they put the base of the electrode, I'm sorry, the district judge puts the base of the electrode where reference figure, reference numeral X is. Reference letter, I believe, would be the correct term. And you can see that X is above where we would put the base of the electrode, which is, you can't really see it too well in this figure, but trust me, it's in there, it's at Y. Just so I know, is one of the caps a little unscrewed on there? Is that why they appear to be at different heights? Exactly. I just want to make sure, because I was looking at it thinking, they don't even look like the same cap, by the way. The one on the right is big and fat and wide, and the one on the left is skinny. Is that? That would have to be, well, let my opponents address that one, Your Honor. I don't know the question on that. I don't know the why for it, but it just initially kind of threw me a little bit when I was looking at it. Well, what you point out, Your Honor, is very accurate and pertinent here. The cap is, in fact, unscrewed. When this thing is sold, these caps would be screwed down, and what you would have is a structure of curved inside surface and an upwardly projecting electrode. It's only when they unscrew the cap and they say, see, here is where the upper surface is, what they refer to as reference plane, reference line 32. I guess the hard thing about using Y, as I understand it, which is probably what drove the district court, is that little protrusion above Y, upon which the cap screws down, is still part of the single molded inside surface. How is it not? It's still molded plastic. There's no electrode exposed there. It's still part of the inside fully enclosed case surface. And I believe that was, in fact, part of the district court's error. The district court said that the inside surface is the portion of the housing that faces toward the animal in use. And the district court said, well, okay, here's the housing. This is part of the housing. That's a surface that faces toward the animal in use. Therefore, that's where the intersection, where the electrode base should be. I believe that is the essence of the district court's error. What we tried to point out in our request for reconsideration is that interpretation of inside surface conflicts with what the patent itself actually says about the inside surface. Namely, the patent says the inside surface faces toward the animal in use and is designed to contact the skin of the animal. This portion that we see here, the portion that's under the unscrewed cap, does not contact the animal's skin, nor is it intended, or in fact, in any way capable of contacting the animal's skin. We said, Judge, we agree with your analysis as far as it went. However, it leaves out the pertinent part, that to be the inside surface, it not only has to be part of the housing, it has to be a part of the housing that contacts the animal's skin during use. And then the court, in essence, threw out that argument for reasons we believe are wrong as well. But in essence, that's the gist of the error that the court made. It failed to take into account the language of the patent itself, saying that the inside surface has to contact the animal's skin in use. And I think it's undisputed that what we see here under the unscrewed portion of the structure does not contact the animal's skin. The idea is to take pressure off the dog's neck. Is that right? Exactly. I'm trying to understand why that would be any different depending on which line, where you draw the line, as you have on page 11, or if it's drawn a millimeter or two lower. No, Your Honor, our position is this is where the accused infringers are drawing the line. They're putting the line up at 32. We're saying that they should be down here. Exactly, this is the accused structure. This is the accused structure. Exactly, that's why I'm trying to understand why there would be a different effect. That is the principle. The law is invention. Whether, again, if it's their line, that's all right. Whether it's where it is or if it's lower by a millimeter or two. Well, my position, my client's position, is of course it makes absolutely no difference whether you can unscrew this or not. From a physical structure, here is the portion, the inside surface. This is what supports the skin of the dog's neck. These are the electrodes, and this design obtains the benefits that my client invented. So we're saying basically... How does it obtain the benefits unless you have the elevation that's required by the claims? Because the elevation is this portion right here, where we're talking about D. We're saying D... That doesn't look very elevated. Well, it's elevated enough to come within the scope of the claims. The idea is that you restrict how far the electrodes can protrude into the dog's neck. It has to go in some distance. If you make these distances too short, then the collar will not be effective. If you make it too long, then you run into problems of abrading the dog's skin and causing problems there. Some of the later claims in the patent go into dimensional analysis about how far these various points have to be above and below. That was not the basis of the district court's grant of summary judgment. The district court basically said that, wait a minute, the electrode base is up here. That's clearly above what you are saying is the high-point surfaces, namely D and E, and therefore can't infringe, period. And I agree with that analysis to the extent it goes. If, in fact, the electrode base is properly at X, as shown in this figure, then there's no question that that's above surface D. We wouldn't be here. Is what you're calling the electrode base an electrode? It's not, is it? It's just the black part of the electrode, which in page 16 is designated as X. No, it's 26. It doesn't say it's 26. So the base is not part of the electrode, is it? Well, the base is part of the electrode under the language of the patent itself. And again, I would suggest that if we need to find out what these claim terms mean, the best source, as this court has said on several occasions, is the patent specification itself. The specification talks about housing, the housing. In trying to work this out, it just seemed to me that what you're calling the electrode base is part of the housing, not part of the electrode. Well, that's exactly what the issue is. We're saying that our interpretation of the language is the housing is down here, the electrode is this upwardly protruding structure in its entirety, and the base of that is where it hits the more or less perpendicular or curved surface of the plane. The district court and my opponent is saying that, even though the housing includes a portion of this upwardly projecting boss, is what I think I've called it in the case, that's our fundamental difference of opinion here. We're saying that a person skilled in the art interpreting this patent and looking at both figures and the accused product would say, no, the base is down here, this is your surface here, base is down here. The district court and radio system say, no, the base is actually up here where you want to screw it. How do you reconcile that with the figure one and two of the patent, which demonstrate the prior art and look a lot like the accused device? Well, as I said, Your Honor, there are some differences. The difference would be that the prior art does not have the portions outside of this, what we call the central area. Yeah, but I think the key point is that your patent describes number five as being the inside surface, the same word inside surface that you used to go on later and describe with relevance to your disclosed embodiment. You label it the same thing, inside surface. And look at number five, that inside surface, if you look at figure two, sits right beneath the electrode. You see it there? So remember you said, no, no, an inside surface has to come in contact with the dog's skin, and that portion of the inside surface underneath the cap can't come in contact with the dog's skin, hence it can't be inside surface as defined in the patent. But, in fact, you, with reference to the prior art, define this as the inside surface, and that little portion there can't come in contact with the dog's skin, not possible. But you still call that the inside surface. Well, that is what the patentee calls it. And again, the best answer to that question, Your Honor, is to say that this is the prior art, and the prior art is what it is, but this is what the invention is as described by the... But I'm trying to figure out what the words inside surface mean, and you told me that one of the reasons the district court erred was because he didn't appreciate that those two little bump-up portions in their accused device are not part of the inside surface. Because if they're the inside surface, they're not the electrode base. It's one or the other. It can't be both. So you're saying they're not part... He wrongly concluded those are part of the inside surface. And you told me the reason he was wrong, and we must know he's wrong, is because every portion of the inside surface has to come in contact with the dog's skin. And I'm saying, well, your patent demonstrates that in the prior art there were portions of the inside surface that didn't come in contact with the dog's skin. And in order to have a valid patent, my invention has to differentiate itself from the prior art. But it didn't differentiate on the basis of must come in contact with the dog's skin, did it? I thought it differentiated on the basis of... It differentiates on a number of bases that go to questions of validity that I don't believe are before the court. Again, I'm saying that for purposes of construing the patent claims as written, one skilled in the art would look at the patent specification, see how is electrode base and inside surface defined in terms of the claimed invention. And I don't mean to belittle the court's question, but the only answer I can give you is that in those figures he's describing what's different. In the rest of the patent, he's saying this is what my invention is, this is how I define it, and this is what these terms mean. Can you give us a real quick couple sentences on the estoppel issue? Yes, the estoppel issue is... We believe the estoppel issue is only with regard to radio systems. There was a predecessor corporation, Initech, and it was acquired by radio systems. We are not seriously questioning the application of estoppel with respect to the 1.4 patent insofar as Initech is concerned. You can say, okay, that happened a long time ago. We don't have a good excuse for that. The court said that there's estoppel as to the 1.4 patent with respect to Initech. What we do challenge is any estoppel issues with respect to either patent with respect to radio systems. Two reasons. Second issued patent, it's clear you cannot have estoppel with respect to the second patent because we never made any comments about the second patent. You hadn't even issued, right? Hadn't even issued. How can a district court say you had given something up when you didn't even have it yet? That's a good question, Your Honor, and that's one of the reasons for asking for review here. As far as privity goes, I think we pointed out in our case, radio systems itself says that when they acquired Initech, they had no knowledge whatsoever of Mr. Lawler's further charges of infringement. Now, I understand that equitable estoppel requires greater detrimental reliance. In order to rely on somebody's action or inaction, you have to know about it. Radio systems admits that they did not know what Mr. Lawler did. But they're in privity. So a parent company is in privity. So why don't they get the benefit of those insights the other company knew? Well, I would respectfully suggest, Your Honor, that I don't believe that this court has ever held that merely being in privity or simply by buying a company than any estoppel attached to the predecessor company may also be enjoyed by a later company. I don't believe this court has ever confronted that issue. I don't think we'd have to. I think the law is clear. And I think that would help you. No, I would respectfully suggest, Your Honor, that in order for there to be reliance, radio systems would have to have relied on something. If they had no knowledge of the actions, they cannot say that they relied on anything Mr. Lawler did if they had no knowledge of that. And to put this in context, Mr. Lawler wrote to Inditech when he had his first patent. They wrote back and said, We've got some prior art. He said, Okay. He took that prior art and went back to his lawyers and they applied for some continuing applications. He then wrote a letter to radio systems not knowing that radio systems had acquired Inditech. He thought it was a whole new company. So he writes to radio systems. They write back a little bit. And the next thing you know, they're off to court with a declaratory judgment action, and that's why we're here. So in his own mind, he had no reason to put radio systems together with Inditech. And by radio systems' own admission, radio systems, when it acquired Inditech, had no knowledge of Mr. Lawler's prior actions. So again, if we go back to the elements of equitable estoppel, it's a detrimental reliance on somebody's actions or inactions when they would have been in circumstances requiring action. Radio systems did not see any action or inaction of Mr. Lawler, therefore could not have detrimentally relied. And getting back to the legal question of, well, even if that attaches to Inditech, does merely purchasing the corporation mean that radio systems then has the benefit of estoppel argument? I don't believe that this court has ruled on that precise issue. This may be an opportunity to do so, but I don't believe that that is established by the president of this court at this time. Does that answer your question? Yes. Okay. Thank you, Mr. Mann. We'll save you a couple of minutes for rebuttal. Thank you, Your Honor. Thank you. Mr. Britton. May it please the court, unless the court has some questions on claim construction, I'm going to jump to the estoppel issue. I think the arguments that I was going to make were made by the court. Okay. You don't want to defend the claim construction? Well, I would defend the claim construction if the court would like. We do have a situation where in order to find infringement, you would have to construe the claims to require that the electrode base is part of the housing. Well, that's not what the patent says. That's not what the patent claims. The patent claims that the inside surface is part of the collar housing and the electrode bases are portions of the electrodes. And what the court did is in applying its claim construction, and its claim construction followed that line, that the inside surface is collar housing, looked at the accused device and decided that the electrode base was in fact part of the electrode and that the inside surface is where that electrode base engages the inside surface. And when you look at where the electrode engages the inside surface, it is above all other portions of the collar housing. So it was proper application of a proper claim construction. On the equitable estoppel point, how could they have given away the 014 patent when it hadn't issued yet? Your Honor, I think what you have to do in this type of situation is look at the totality of the circumstances and first of all... I don't mean 014, I meant 082. 014 is parent 082 child. Yes, Your Honor. How could they have given away the 082 patent when it didn't exist yet? The question is not whether they gave it up by not suing on it before they got it. We all know that they can't sue on it until they have it. The question is did they preserve their right to sue on it under the circumstances of this case. And in earlier precedent in the Jamesbury case, I believe, there was some indication... Or no, it was Ackerman. There was some indication that you may treat a later patent the same as the earlier patent if the circumstances dictate. Here you have a situation where... I don't understand. How in the world do they have to preserve it? It doesn't make sense. They don't have a patent. They don't have anything to preserve because they don't have a property right yet. So you would like us to create a rule that says they have to do something, you know, reserve a place for my unborn child at your school. The child doesn't exist. How are we supposed to force some sort of preservation rule upon them when they don't have a property right? Well, I think we have seen this in other precedents where a party, for example, seeks to reissue on a patent. He's already sent a cease and desist letter. He's already misled that accused infringer into believing that there's no problem. If he can't send you a letter misleading you into believing there's no problem, look at the 082 patent and the 014 patent. Totally different claims. So the claims scope is different. Different inventive aspects were claimed. So how could he, when he said, okay, I'm not going to sue you on the 014, how could that be construed as misleading you into and I'm not going to sue you on this separate patent which is directed to different aspects of an invention? It was directed to different aspects of the same invention, but it was targeted at the UltraSmart device, the original cease and desist letter. So what, he didn't give you some blanket, you know, equitable estoppel. I will never sue you on anything, doesn't matter what kind of patent I come up with. He said, I'm not going to sue you on the 014. That's your equitable estoppel argument. Well, if we allow that to happen, then the key to avoiding estoppel is go out and seek a reissue or seek a new patent, change the scope of the claims, and then rebring your suit. And you essentially render estoppel irrelevant. Does it make a difference, such as in this case, where the 082 patent was issued as a result of a continuation in part process? I think it's significant that it's a continuation in part, but it's more significant that it was an effort to get around our April 29 letter that says we've got prior art that kills your 014 patent. Well, there's nothing to show that they were trying to avoid. I thought your argument was simply that your product doesn't use the additional change that's in the continuation in part, and so it doesn't apply, and that's the end of it. Well, we are taking the position that we don't infringe, and we are taking the position that this later patent is invalid for various reasons. But, you know, we are stuck with where the court came out, and that is a ruling that estoppel extends to the 082 patent. So we have other defenses. We have other arguments. And, counsel, you know, in this case, it's not even like they actually— when I gave you my hypothetical of they said, you know, I won't sue you on this, they actually never told you anything affirmative. We're not going to sue you. It was silence. They sent a cease and desist letter. You said, well, goodness, we've got some prior art that might invalidate your claim. And then there was silence. And you construed the silence, possibly correctly, in a way that benefits you for equitable self with regard to that patent. But how could your good prior art necessarily threaten their new patent, 082? There's just not—it's too tenuous to suggest that when they get new and different claims that your good prior art—do you see the problem I'm having? The problem I'm having is they didn't say, well, goodness, you made such a good case for non-infringement, we're going to walk away. I mean, your case was really—wasn't it? Weren't you really presenting them with prior art and saying, well, goodness, we don't think this is a great patent? Equitable estoppel, the way I see it, is to prevent someone from asserting a claim later on that they should have brought at an earlier date. And in this situation, we have a situation where they accuse our ultra-smart design. But wait a minute. I think—I'll be honest. I think that you're overly broad in equitable estoppel. For example, we have a case that said—talks about de minimis, right? I'm not going to sue you right now because it turns out you're making a de minimis amount of the product. So I'm not going to sue you right now. That is not a promise that I will never sue you if your circumstances should change. So I think your initial statement about equitable estoppel as applying to an entire claim for all purposes is way too broad and not consistent with our precedent. I did not mean to say that all they had to do is make a claim and then you have an entitlement. But there are things that they could have done to put us on notice that the claim had not been abandoned. All they had to do was write us and say— There wasn't a claim with regard to the 082—I keep getting them mixed up—082 patent because it hadn't issued yet. So why would they put you on notice that they're not abandoning something they don't even have a right to do yet? Well, what I'm saying is that had they told us in response to the April 29, 2005 letter that the issue was not over, then— But it was over. How could it not be over? They didn't have a property right they could assert against you. So it was over at that point in time, but then they got a new property right and that created a new issue. It was over with respect to that. But let's analogize to the reissue situation. If we are unaware that they are seeking a reissue of that same patent, the result is they get new claims down the road. But that's actually perfectly appropriate in this case because the only reason they backed away was because you said, aha, but I think I might be able to invalidate your claim. So they go back to the PTO and even present that same prior art to the office in a reissue and then say, so we're going to seek narrower claims as a result to avoid this prior art. Then I think why aren't they free to come back at you with that different patent that has obviated the concern that you brought to their attention? I would say that they would be free, but for the fact that there's a holding of the district court, and I think it's a proper holding, that there was initial misleading conduct. I think that any time where you have that initial misleading... What is the initial misleading conduct here? It's their silence. Correct. They were silent when you said we think we can invalidate your patent. And we are led to believe that we can continue to produce. No one has ever told us anything different. Now, as I've noted, this court does have precedent that says that in a reissue situation like that, that notice should be given. Why is the CIP any different from the reissue situation? All they did is they had another patent that fits in between in the family pending, so rather than seeking a reissue, they sought a CIP with narrower claims. So why is that different from a situation where they're exploiting the system to narrow that first patent? You mentioned in the case of a reissue patent, we have precedent that says they're required to give notice. What precedent are you referring to? I'm not entirely sure that I know what case you're talking about. And if you know, you can pat the nose up and wipe your mouth, for goodness sake. It's Waffle, Tecsh Machinen versus Mechanica. It's 9-44-FED-2-870. You're saying that this says that you must tell someone that you might sue someday? Well, I'm not sure that it says you must. In this circumstance, the court found that it would have been appropriate. I thought you told us that they somehow prejudiced themselves by not telling you they had a pending CIP? This was not a CIP. It was a situation where they had pursued reissue. In the case before us, it was a CIP, was it not? The case before us, it is a CIP. Are you saying they had an obligation to say that they had applied for a CIP? What I'm saying is that this is equivalent to that situation where you seek a reissue. I think the court in this Federal Circuit opinion was saying that if you send a cease and desist letter and then you don't respond to them after they say get lost, that if you're going to seek new claims, let them know you're going to do that so that they know how to conduct business. And what I'm saying is that... You're telling us that it would be a courteous thing to do or that it's obligatory? I think it should be obligatory if you're going to seek new claims for an attack on the same product, whether it's in the reissue situation or the CIP situation. So to be clear on this appeal, you're relying only on estoppel for the CIP and not on non-infringement? I know that you mentioned the subject matter in your brief, but you're not relying on it? It was not before the court. This was on summary judgment, so there was a lot that wasn't on the table. On summary judgment, the attack on the 082 is on its validity? You're telling us that if we disagree with what the court did on summary judgment but think that perhaps your side should have prevailed anyway, the court has no authority to say so? I think you should look a little more deeply at the authority of the Federal Judiciary. I missed your question. You said it's not before the court. Even though a decision could be sustained on any ground, it seems to me that there are myriad cases which say that a decision can be sustained on any ground supported by the record. It may not be reversible on any ground supported by the record, but it can be sustained on any ground supported by the record, and you're saying that that's incorrect? No, I'm not saying that's incorrect, Your Honor. I didn't mean to say that if I did. Okay, anything else you need to tell us? No, Your Honor. Any more questions? Okay, thank you, Mr. Britten. Mr. Mann, a couple of minutes. Okay. Thank you, Your Honor. Again, I think the court has appreciated that we are dealing with a continuation in part patent here, not a reissue, and I think there's a big distinction between a reissue patent and a continuation in part. I would refer the court's attention. We are relying on Stark v. Advanced Magnetics, 29 F. 3rd, 1570, a 1994 decision of this court that our interpretation is that separate application patents, even if they're related, they are all treated separately for purposes of fletches and estoppel, and I think that is consistent with our position in this case. I believe that to be the law in this circuit, but, of course, that's your department, so I would refer that case, of course, as one we're depending on. Second thing, as far as this general concept that you have to give a potential infringer notice of what you're intending to do with other patents, that's contrary to my experience. I've been practicing nearly 30 years. I've advised a number of clients on whether this particular patent infringes, whether they have a problem with it. I've given many opinions saying, no, you have no problem with this patent. However, be aware, next Tuesday, it's entirely possible that another patent may issue based on this that has claims of covering. I think that's the normal practice and practice of law. No lawyer I'm aware of says that you don't infringe this patent, and, therefore, you don't have to worry about any continuing applications that may stem off of this patent. That's, again, contrary to what I believe the law is, and I believe it's contrary to what accepted practice is here. For all these reasons, Your Honor, we believe that the district court made an error in its ruling throwing out Mr. Lawler's case, and I would ask that this court reverse that and remand it for further proceedings. Thank you. Thank you. Thank you, Mr. Mann. Mr. Britton, the case is taken into submission. All rise.